```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 9:24-CR-80154-RS-1
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
         GOVERNMENT,               )
 5                                 )
         -v-                       )
 6                                 )
    DAFUD IZA,                     )
 7                                 )
         DEFENDANT.                )    West Palm Beach, Florida
 8                                 )    April 18, 2025
    _____)
 9


10            TRANSCRIPT OF CHANGE OF PLEA PROCEEDINGS

11             BEFORE THE HONORABLE BRUCE E. REINHART

12                 UNITED STATES MAGISTRATE JUDGE


13


14   Appearances:

15   FOR THE GOVERNMENT  D. Keith Clouser, ESQ.
                         U.S. Department of Justice
16                       Criminal Division, Fraud Section
                         1400 New York Avenue, Northwest, 8th Floor
17                       Washington, DC 20530

18   FOR THE DEFENDANT   David J. Joffe, ESQ.
                         110 Southeast 6th Street, Suite 1700
19                       Fort Lauderdale, FL 33301

20   TRANSCRIBER:        Stephen W. Franklin, RMR, CRR, CPE
     (561)313-8439       Official Court Reporter
21                       623 Rock Street
                         Little Rock, AR 72202
22                       E-mail:  SFranklinUSDC@aol.com

23        Proceedings recorded by Digital Audio Recording, and
     transcript prepared utilizing computer-aided transcription.
24

25
```

1          (Call to the order of the Court at 10:51 a.m.)

2          **THE COURT:**  All right.  Good morning, sir.  We're

3   starting a little bit late.  This is United States of America

4   versus Dafud Iza.  May I have appearance for the government,

5   please.

6          **MR. CLOUSER:**  Thank you, Your Honor.  Keith Clouser

7   for the United States.

8          **THE COURT:**  Hi, Mr. Clouser.

9      For the defense?

10         **MR. JOFFE:**  Good morning, Your Honor.  Attorney David

11  Joffe on behalf of Dafud Iza, who's present before the Court.

12         **THE COURT:**  Good to see you, Mr. Joffe.  It's been a

13  long time.

14         **MR. JOFFE:**  It has.  Good to see you, Your Honor.

15         **THE COURT:**  All right.  Very well.  Good morning, Mr.

16  Iza.

17         **THE DEFENDANT:**  Good morning.

18         **THE COURT:**  Mr. Iza, can you pull that microphone

19  over to you?  I'm going to be asking you a lot of questions,

20  and we just need to hear you on the record.

21         **THE DEFENDANT:**  Okay.

22         **THE COURT:**  Thank you.

23      Mr. Iza, can you just raise your hand, please, sir?

24      (The Defendant was duly sworn.)

25         **THE COURT:**  All right.  Do you understand that by

1  taking that oath and swearing to tell the truth, if you now

2  were to lie to me you'd be committing a new crime?  That's the

3  crime of perjury, and that's punishable by up to five years.

4          **THE DEFENDANT:**  I do.

5          **THE COURT:**  Okay.  I understand we're here today

6  because you may like to change your plea in this case from a

7  not guilty plea to a guilty plea.  In federal court you can't

8  change your plea like that without getting permission from the

9  court, and before I can give you permission I need to satisfy

10  myself of four things:

11          First, I need to be satisfied that you're alert and awake

12  and you understand what's happening here and you're thinking

13  clearly.  Second, I need to be satisfied that you know what

14  your options are, because you don't have to plead guilty.  You

15  can proceed with a not guilty plea.  Third, I need to be

16  satisfied you know what rights you're going to give up if you

17  plead guilty, because there are rights that you're going to

18  give up.  And finally, I need to be satisfied that you know

19  what the possible penalties and other consequences are of a

20  change of plea.

21          Also, here in federal court you can't plead guilty to

22  something you didn't do.  And so I'll have to ask the

23  government to tell me what the facts of the case are, and I'll

24  need you to agree that those facts could have been proven if we

25  had a trial.

1      So do you understand that's why we need to have this

2  hearing and why I need to ask you all these questions?

3           **THE DEFENDANT:**  Now, I do.

4           **THE COURT:**  Okay.  Great.

5      I'm going to ask you a bunch of questions.

6           **THE DEFENDANT:**  Uh-huh.

7           **THE COURT:**  If you don't understand my question,

8  please tell me, I'll try to ask you a more clear question.

9           **THE DEFENDANT:**  Okay.

10           **THE COURT:**  And if, at any time, you want to pause

11  and speak to Mr. Joffe before continuing or answering a

12  question just please let me know, and I'll allow you time to

13  speak to your lawyer.  Can you do that for me?

14           **THE DEFENDANT:**  I will.

15           **THE COURT:**  All right.  Thank you very much.

16      For the record, can you please tell us your full name?

17           **THE DEFENDANT:**  Dafud Iza.

18           **THE COURT:**  And how old are you, Mr. Iza?

19           **THE DEFENDANT:**  54.

20           **THE COURT:**  And how far did you go in school?

21           **THE DEFENDANT:**  MBA.

22           **THE COURT:**  All right.  And where was that?

23           **THE DEFENDANT:**  Indiana Wesleyan University.

24           **THE COURT:**  Okay.  And do you have any issues

25  reading, writing or understanding English?

1        **THE DEFENDANT:**  Sometimes.

2        **THE COURT:**  Sometimes.

3    Okay.  For purposes of today, are you having any trouble

4    understanding me?

5        **THE DEFENDANT:**  No, no, no.

6        **THE COURT:**  What is your native language?

7        **THE DEFENDANT:**  Spanish.

8        **THE COURT:**  Okay.  All right.  Mr. Joffe, in your

9    interactions with Mr. Iza throughout the trial (sic), have you

10   had any issues communicating with him in English?

11       **MR. JOFFE:**  No, Your Honor.

12       **THE COURT:**  Okay.  So you don't believe there's a

13   need for an interpreter?

14       **MR. JOFFE:**  No, Your Honor.

15       **THE COURT:**  Okay.  All right.  Thank you.

16   Mr. Iza, if at any time you don't, like I said, you don't

17   understand my question because you don't understand the

18   language I'm using, let me know and I'll try to rephrase my

19   question.

20       **THE DEFENDANT:**  Great.

21       **THE COURT:**  Okay.  Mr. Iza, have you ever been

22   treated for any mental illness or addiction to narcotic drugs

23   of any kind?

24       **THE DEFENDANT:**  No.

25       **THE COURT:**  Are you currently under the influence of

1  any things, drugs, alcohol or anything else that affects your

2  ability to think clearly?

3          **THE DEFENDANT:**  No.

4          **THE COURT:**  Have you taken any medicine at all in the

5  last 24 hours, even if it was prescribed for you by a doctor?

6          **THE DEFENDANT:**  Yes.

7          **THE COURT:**  What is that you've taken?

8          **THE DEFENDANT:**  Taken two pills from my heart

9  condition.

10         **THE COURT:**  Okay.  Does that affect your thinking at

11 all?

12         **THE DEFENDANT:**  No, no, no.

13         **THE COURT:**  How are you feeling as you sit here right

14 now?

15         **THE DEFENDANT:**  Fine.  I'm fine.

16         **THE COURT:**  You thinking clearly?

17         **THE DEFENDANT:**  Yes.

18         **THE COURT:**  Okay.  Based on my observations of

19 Mr. Iza and his responses to all my questions, I find that he

20 is alert, awake, competent to proceed and is fully

21 comprehending the conversation that we're having, so I'm going

22 to proceed with the hearing here today.

23     Mr. Iza, if your plea is accepted, the next step in this

24 case will be to go to sentencing, but I'm not going to be the

25 judge who sentences you.  That is Judge Robin Rosenberg.  You

 1  do have the right under the law to wait and have Judge

 2  Rosenberg do your change of plea hearing if you want to.  Do

 3  you understand you have that option?

 4           THE DEFENDANT:  Yes, I do.

 5           THE COURT:  On the other hand, if it's agreeable to

 6  you, I can conduct the hearing today.  Do you understand you

 7  have that option?

 8           THE DEFENDANT:  Yes, I do.

 9           THE COURT:  Have you had a chance to talk to

10  Mr. Joffe about both of those options?

11           THE DEFENDANT:  100 percent, yes.

12           THE COURT:  All right.  And understanding that you

13  have the option to wait for Judge Rosenberg, is it okay with

14  you that I go ahead and conduct the hearing today?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  Any objection from the government?

17           MR. CLOUSER:  No objection, Your Honor.

18           THE COURT:  All right.  I find that Mr. Iza's

19  decision to consent to allow me to conduct the hearing is a

20  knowing, voluntary and fully informed decision.

21       Mr. Iza, have you received a copy of the information --

22  that's the piece of paper containing the written charges in the

23  case -- and have you fully discussed the charges and the case

24  with your lawyer, Mr. Joffe?

25           THE DEFENDANT:  Yes, I did.

1       **THE COURT:**  Have you had enough time to think about

2  the case and to discuss it with Mr. Joffe?

3       **THE DEFENDANT:**  Yes, sir.

4       **THE COURT:**  Did you retain Mr. Joffe, or did the

5  court appoint him to help you in this case?

6       **THE DEFENDANT:**  I did retain him.

7       **THE COURT:**  You hired Mr. Joffe on your own.  Well,

8  you made a very good decision.  He's a very good lawyer.

9       All right.  So the charge against you in this case that

10  the plea agreement says that you will plead guilty to -- let me

11  just double check -- is a. -- is it a healthcare fraud scheme,

12  Mr. Clouser?

13       **MR. CLOUSER:**  Your Honor, it's major frauds against

14  the United States.

15       **THE COURT:**  Okay.  1031.  Okay.  Got it.

16       All right.  And so it is a crime of committing a fraud

17  against the United States.

18       Mr. Clouser, can you just put on the record, what are the

19  elements of the crime that the government would have to prove

20  if we had a trial?

21       **MR. CLOUSER:**  Thank you, Your Honor.

22       To convict a defendant of a violation of 18 U.S.C. 1031,

23  the government must prove:

24       One, the defendant knowingly used or tried to use a scheme

25  with the intent to defraud the United States, or to get money

1  or property by using materially false or fraudulent pretenses,

2  representations or promises;

3       Two, the scheme took place as part of acquiring money in

4  any grant, contract, subcontract, subsidy, loan, guarantee,

5  insurance, or other form of federal assistance; and

6       Three, the value of the contract -- the value of the

7  grant, contract, subcontract, subsidy, loan, guarantee,

8  insurance, or other form of federal assistance was $1 million

9  or more.

10       **THE COURT:**  Okay.  And the mens rea is knowingly or

11  willfully?

12       **MR. CLOUSER:**  It is knowingly, with the intent to

13  defraud.

14       **THE COURT:**  With the intent to defraud.

15       Okay.  So Mr. Iza, first of all, have you -- those are the

16  elements.  Those are the different parts of the crime the

17  government would have to prove.

18       To simplify that a little bit, what it means is you would

19  have to have lied and made a misstatement to the government

20  to -- or misstatement for purposes of obtaining more than a

21  million dollars in government grant money, and that you did

22  that knowingly, meaning it wasn't a mistake or an accident, and

23  with the intent to defraud, meaning you intended for the other

24  person to rely on it and to be fooled by it.  Again, I'm

25  simplifying, but you understand that's the charge against you?

1          **THE DEFENDANT:**  Yes, I do.

2          **THE COURT:**  Have you fully discussed with Mr. Joffe

3    what the elements are that the government would have to prove

4    and whether you might have any defenses to those charges?

5          **THE DEFENDANT:**  Yes, yes, sir.

6          **THE COURT:**  Okay.  And you've had enough time to talk

7    about the charges with your lawyer?

8          **THE DEFENDANT:**  Yep.

9          **THE COURT:**  All right.  Have you and your lawyer gone

10   over the discovery?  That's the evidence the government says it

11   would use to try to prove the case against you.  Did you sit

12   down with your lawyer and talk about and look at, or these

13   are -- this is the evidence the government would use?

14         **THE DEFENDANT:**  What is the discovery?

15         **THE COURT:**  The discovery, I said it's the evidence

16   the government would use to prove the case against you.

17         So have you sat down and either your lawyer, or maybe you

18   sat down with the government and they showed you, these are the

19   bank records we're going to use, these are the claims that were

20   filed, these are the applications, things like that?

21         **THE DEFENDANT:**  I will say, "yes."

22         **THE COURT:**  Okay.  Tell me a little bit more.  I

23   mean, you may not have looked at every piece of evidence, but

24   have you either talked with your lawyer?  Maybe, like I said,

25   sometimes they have what they call a reverse proffer, a meeting

```
 1    with the government, and the government says, look, this is the
 2    evidence we're going to use against you --
 3             THE DEFENDANT:  Uh-huh.
 4             THE COURT:  But are you generally aware of what the
 5    evidence is that the government would have tried to use if we
 6    had a trial?
 7             THE DEFENDANT:  Yes.
 8             THE COURT:  Okay.  Again, in a case like this I
 9    assume, I don't know, I haven't seen it, but the government
10    would have records of submissions that were made to the
11    government.  Let me just see.  Well, we'll come back to that.
12    When we get back to this later, we'll talk -- I'll ask the
13    government to put the factual basis in the record --
14             THE DEFENDANT:  Okay.
15             THE COURT:  And I'll ask you whether you agree that
16    those facts are true.  Presumably you'll be aware of that.
17             MR. JOFFE:  Your Honor, we've had --
18             THE COURT:  Yes, Mr. Joffe?
19             MR. JOFFE:  We've had multiple meetings with the
20    government, including meetings with DOJ in Washington, D.C.
21             THE COURT:  Okay.
22             MR. JOFFE:  So ...
23             THE COURT:  To review the evidence in the case?
24             MR. JOFFE:  To debrief, and, yes.
25             THE COURT:  Okay.
```

1    **MR. JOFFE:**  So my client is intimately -- he knows

2    what the discovery, what the evidence is in the case.

3    **THE COURT:**  That's all.

4    **MR. JOFFE:**  Yes.

5    **THE COURT:**  But again, Mr. Iza, again, the purpose of

6    my question is twofold.  One is you can't be guilty to

7    something you didn't do.

8    **THE DEFENDANT:**  Uh-huh.

9    **THE COURT:**  And ultimately the government has to

10    prove it.  You don't have to disprove it, they have to prove

11    it.

12    So in order for you to make an informed decision about

13    whether to plead guilty or not, you kinda have to know what

14    you're facing, what the evidence is that would have been

15    introduced.  So that's the purpose of my question.  Are you

16    comfortable that you -- you've -- that you know what would have

17    happened if you went to a trial, what the government would have

18    tried to prove and how they would have tried to prove it?

19    **THE DEFENDANT:**  Yes, yes.

20    **THE COURT:**  All right.  You're comfortable with that?

21    **THE DEFENDANT:**  Yeah.

22    **THE COURT:**  Okay.  And the second thing is I just

23    want to make sure that you've had enough time to talk to your

24    lawyer about that.  You know, obviously if you're making a

25    decision in part based on, well, you know, I think it's pretty

1   likely I'm going to get convicted, because I've seen the

2   evidence and I've talked to my lawyer about it, I just wanted

3   to make sure you felt comfortable that you've had enough time

4   to talk to Mr. Joffe and to evaluate, you know, what your

5   chances are if you had gone to trial.

6          **THE DEFENDANT:**  Yes, 100 percent.

7          **THE COURT:**  Okay.  Thank you.  That was the purpose

8   of my question.

9          **THE DEFENDANT:**  Yeah.

10          **THE COURT:**  Thank you for clarifying that.

11          **THE DEFENDANT:**  Yeah.

12          **THE COURT:**  I don't think it probably applies in this

13   case, but I'll ask it anyway.

14          Sometimes there's an argument, particularly in cases where

15   there's been a search of some kind, that the government

16   obtained its evidence illegally; that the government, you know,

17   broke into your house and took your stuff, and they didn't have

18   the legal right to do that.  And the way that a defendant makes

19   that argument is they file something called a Motion to

20   Suppress Evidence.

21          Is that something you've at least considered or talked

22   about with your lawyer, whether you could in this case have

23   filed a motion to suppress?

24          **THE DEFENDANT:**  Can I have a word with my attorney?

25          **THE COURT:**  Yeah, please.

```
 1          (Discussion had between defense counsel and defendant.)

 2               THE COURT:  Yeah.  Mr. Joffe?

 3               MR. JOFFE:  You're asking questions that -- you know,

 4     my client's -- and I don't know how much to put on this record,

 5     because it's all discoverable, so ...

 6               THE COURT:  Don't disclose attorney/client

 7     communications.  I just ...

 8               MR. JOFFE:  Well, you know, my -- I'm a little at

 9     odds as to how much to say.  We're here for a change of plea.

10     My client's cellphone was seized by his business from the

11     outset.

12               THE COURT:  Uh-huh.

13               MR. JOFFE:  There may have been items in there that

14     theoretically could have been suppressible, but his cellphone

15     was taken --

16               THE COURT:  Uh-huh.

17               MR. JOFFE:  -- by the business at the outset.

18               THE COURT:  Okay.  But by the business, or by the

19     government?  I mean ...

20               MR. JOFFE:  Well, it may have been at some point at

21     the behest of the government.  I wasn't involved at that point.

22               THE COURT:  Uh-huh.

23               MR. JOFFE:  There was a prior attorney involved, and

24     then I became involved after that attorney was involved --

25               THE COURT:  I see.
```

1    **MR. JOFFE:**  -- at the beginning.  And at that point

2 my client was cooperating with the government.

3    **THE COURT:**  Understood.  Okay.

4    **MR. CLOUSER:**  Your Honor, may I make one point of

5 clarification?

6    **THE COURT:**  Absolutely, Mr. Clouser.

7    **MR. CLOUSER:**  So the government was not involved in

8 any prior seizure of his, Mr. Iza's cellphone.  The government

9 did obtain a search warrant and seized Mr. Iza's cellphone

10 pursuant to that warrant.

11    **THE COURT:**  From the employer?

12    **MR. CLOUSER:**  No, from Mr. Iza --

13    **THE COURT:**  From Mr. Iza.  Okay.

14    **MR. CLOUSER:**  -- I assume later in time, and then the

15 government obtained consent from Mr. Iza to conduct a search.

16    **THE COURT:**  Understood.

17  So listen, again, Mr. Iza, I'm not trying to make mischief

18 here.  I'm not trying to make things difficult.  Candidly, what

19 I'm trying to front out is this:  As I'll explain to you later

20 on --

21    **THE DEFENDANT:**  Uh-huh.

22    **THE COURT:**  -- when we get to this part of the

23 discussion, if you go ahead and plead guilty today you're

24 giving up some things.  One of the things you're giving up is

25 your chance to ever come back to court and say, hey, the

1  government got their evidence illegally.  Okay?  There have

2  been cases in the past where someone goes through a case, they

3  plead guilty, they get sentenced, they don't like the sentence

4  that they got, and now they come back to court and they say,

5  wait a minute, essentially, my lawyer screwed up because my

6  lawyer didn't tell me I needed to file a motion to suppress, or

7  I should have filed a motion to suppress, and I want my

8  conviction set aside, and I want a do-over because my lawyer

9  screwed up.

10      So that's really the basis of my question.  I don't want

11  you -- you're not going to be able to come back later --

12          **THE DEFENDANT:**  Yeah, yeah.

13          **THE COURT:**  -- and say, oh, I never knew that I could

14  have tried to throw out the government's evidence.

15      Now, there's all kinds of reasons why someone doesn't file

16  a motion to suppress.  They may look at it and say, the search

17  warrant was good, we're not going to win, or, I'm trying to

18  cooperate, and I don't want to anger the government by fighting

19  them when I'm trying to cooperate with them.  So I'm not saying

20  there's anything that you or Mr. Joffe has done wrong by not

21  filing a motion to suppress, but before you give up that right

22  forever, I just want to make sure you're aware that that is a

23  motion you maybe could have filed in this case, and you've

24  chosen not to file it.

25      Do you understand?

1        **THE DEFENDANT:**  Not really.

2        **THE COURT:**  Not really.  Okay.  Let me try it a

3   different way.

4        Sometimes when a defendant is confronted with a case

5   brought by the government there is -- if you can succeed in

6   getting some of the evidence thrown out the case falls apart,

7   and you can win your case by getting the government's evidence

8   thrown out.  Okay?

9        Sometimes, like for example, the case that was here right

10  before you --

11       **THE DEFENDANT:**  Uh-huh.

12       **THE COURT:**  -- the government did a search warrant.

13  They found a bunch of drugs in somebody's apartment.  Well, if

14  the drugs get thrown out the government has no case, and the

15  defendant can win.  You under' -- with me so far?

16       **THE DEFENDANT:**  Yeah.

17       **THE COURT:**  Okay.  And sometimes there's cases where

18  it doesn't really matter what evidence the government got in

19  the search, because they got plenty of other evidence.  And

20  sometimes cases like this are that, they're historical cases.

21  There's tons of records of, you know, filings being submitted

22  to a government agency, of money being sent out.  Maybe there's

23  undercover tapes.  I don't know.  I don't know the facts of

24  your case.

25       So sometimes even if you succeed in getting the

1  government's evidence thrown out, you still lose.  So you with

2  me?  Still with me?

3          **THE DEFENDANT:**  Yes, yes.

4          **THE COURT:**  Okay.  So that's why I say sometimes not

5  filing a motion for to suppress doesn't really change anything.

6          **THE DEFENDANT:**  Yeah.

7          **THE COURT:**  And sometimes it does.

8      Okay.  Again, I don't know your case.

9          **THE DEFENDANT:**  Yeah.

10         **THE COURT:**  Sometimes for strategic reasons someone

11  says, look, I'm trying to cooperate with the government because

12  I think that's the best thing for me to do.  Okay?  I don't

13  want to fight them, I want to cooperate.  And if I file a

14  motion they're not going to let me cooperate, or they're not

15  going to be so generous to me about my cooperation.  So I'm

16  going to make that decision not to file the motion even though

17  I might win on the motion.

18      You understand that?

19         **THE DEFENDANT:**  100 percent.

20         **THE COURT:**  Okay.  So all I'm just trying to explore

21  here with you is whether you're aware of that, aware that you

22  could have filed a motion to suppress if you wanted to, you

23  haven't filed one, and that you're okay with that.  That's

24  really what I'm trying to understand.

25         **THE DEFENDANT:**  Okay.  So I understand.

1    I agree.  I agree.  I mean, the Department of Justice

2    didn't do anything wrong from the moment that they start this

3    process.

4              **THE COURT:**  Okay.

5              **THE DEFENDANT:**  What my concern is what happened

6    prior to that.

7              **THE COURT:**  Okay.

8              **THE DEFENDANT:**  So, you know.

9              **THE COURT:**  But in terms of -- so, okay.  So you're

10   aware that you -- you're comfortable with the fact that you and

11   your lawyer have not filed a motion to suppress in this case?

12             **THE DEFENDANT:**  Yes, I am.

13             **THE COURT:**  Okay.  That's all I wanted to make sure.

14             **THE DEFENDANT:**  Okay.

15             **THE COURT:**  Sorry to take so long to get there.

16             **THE DEFENDANT:**  No, no, that's fine.

17             **THE COURT:**  Okay.  Fine.

18        More generally, then, let me ask you, are you -- in

19   working with Mr. Joffe and your prior lawyers, have they

20   answered all of the questions that you have about the case,

21   about the charges, the defenses, the evidence, things like

22   that?

23             **THE DEFENDANT:**  Since I retained Mr. Joffe my life

24   changed.

25             **THE COURT:**  Okay.

```
 1              THE DEFENDANT:  Before, no.
 2              THE COURT:  Okay.
 3              THE DEFENDANT:  The answer to that is after
 4    Mr. Joffe, yes.
 5              THE COURT:  Okay.
 6              THE DEFENDANT:  But prior to that, no.
 7              THE COURT:  Okay.  And Mr. Joffe, just clarify for
 8    me.  Did you come into the case before or after the case was
 9    actually charged?
10              MR. JOFFE:  After.
11              THE COURT:  After the case was charged.  Okay.
12              MR. JOFFE:  Before --
13              THE COURT:  I'm sorry.
14              MR. JOFFE:  Before it was charged.
15              THE COURT:  Okay.  So maybe after the search or some
16    other indicia that there -- before -- after Mr. Iza knew there
17    was an investigation, but before formal charges were brought?
18              MR. JOFFE:  Yes.
19              THE DEFENDANT:  Uh-huh.
20              THE COURT:  I assume that's why we have an
21    information in this case?
22              MR. JOFFE:  Yes.
23              THE DEFENDANT:  Uh-huh.
24              THE COURT:  Okay.
25              MR. JOFFE:  Yes.
```

1    **THE COURT:**  Okay.  So Mr. Iza, in terms of at least

2  evaluating the charges that have been brought, what the

3  government would have to prove, whether you would have defenses

4  to those charges, all the things that would have happened sort

5  of since Mr. Joffe came into the case, are you fully satisfied

6  with Mr. Joffe and the advice and representation he's given you

7  in this case?

8    **THE DEFENDANT:**  Yes, sir.  Yes.

9    **THE COURT:**  Okay.  Has he done everything you've

10  asked him to do?  For example, you might have asked him to go

11  talk to witnesses, obviously you asked him to communicate with

12  the government about cooperation, but has he done everything

13  you've asked him to do?

14    **THE DEFENDANT:**  Well, the good news is that I don't

15  need to ask him for anything.  He's proactive on everything

16  that I need.

17    **THE COURT:**  Okay.

18    **THE DEFENDANT:**  Yeah.

19    **THE COURT:**  But, so the point -- the answer to that

20  is you're --

21    **THE DEFENDANT:**  Yes.

22    **THE COURT:**  You think he's done everything you needed

23  him to do so you could make an informed decision in this case?

24    **THE DEFENDANT:**  That's correct.

25    **THE COURT:**  Okay.  Very well.

1    All right.  Mr. Iza, I have a document here called a Plea

2  Agreement.

3           **THE DEFENDANT:**  Uh-huh.

4           **THE COURT:**  It is 12 pages long.

5           **THE DEFENDANT:**  Uh-huh.

6           **THE COURT:**  I'm going to hold up the very last page

7  here.  Hope you can see it from there.  Is that your signature

8  on the second line from the bottom?

9           **THE DEFENDANT:**  Yes, sir.

10          **THE COURT:**  Before you signed this document, did you

11  and Mr. Joffe go over every single one of the paragraphs, all

12  22 paragraphs?

13          **THE DEFENDANT:**  Yes, sir.

14          **THE COURT:**  Did he explain to you what each of those

15  paragraphs calls for?

16          **THE DEFENDANT:**  Yes, sir.

17          **THE COURT:**  Did he answer all your questions about

18  this plea agreement?

19          **THE DEFENDANT:**  Yes, sir.

20          **THE COURT:**  As you sit here are you comfortable that

21  you understand what you're agreeing to do and what the

22  government's agreeing to do?

23          **THE DEFENDANT:**  Yes, sir.

24          **THE COURT:**  Okay.  Very good.

25    I need to go through some of this with you.  Do you have a

```
 1    copy there?
 2              THE DEFENDANT:  Yeah.
 3              THE COURT:  I'll try to tell you which paragraph I'm
 4    looking at as we go through it.  I'm not going to go through
 5    every paragraph --
 6              THE DEFENDANT:  Uh-huh.
 7              THE COURT:  -- but we do need to cover some of this.
 8         So paragraph 1 just talks about what the charge is, and
 9    the government already explained what those elements are, and
10    you've told me you understand what the elements are.
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  Paragraph 3 and 4 talk about what the
13    penalties are, and they say that the worst possible sentence
14    Judge Rosenberg could give you in this case is 10 years in
15    jail, followed by up to three years of court supervision after
16    you're released from jail, a fine of, it says up to the greater
17    of $5 million.  I assume that's $5 million, or twice the gain
18    or loss.
19              MR. CLOUSER:  It is actually just a maximum of $5
20    million.
21              THE COURT:  Up to $5 million.  Okay.  So a $5 million
22    fine, and then $100 in court costs, as well as ...
23         So do you understand that's the worst sentence Judge
24    Rosenberg could give you, Mr. Iza?
25              THE DEFENDANT:  Yes, yes.
```

```
 1              THE COURT:  Mr. Iza, I only ask this question because
 2    it relates to whether I need to advise you of other rights that
 3    you have.
 4         Are you a U.S.  Citizen?
 5              THE DEFENDANT:  Yes, I am.
 6              THE COURT:  Okay.  Now, as a result of your ...
 7    sorry.
 8         Okay.  So those are the maximum penalties.  I go over the
 9    maximum penalties for two important reasons:  One is there are
10    what are called collateral consequences of this plea, since
11    this is a felony.  So pleading guilty to this charge may result
12    in you losing valuable rights, such as the right to vote, the
13    right to serve on a jury, the right to hold public office, the
14    right to possess a firearm, the right to participate in any
15    sort of government healthcare programs, possibly the right to
16    possess any sort of professional licenses.
17         So do you understand those are the potential collateral
18    consequences of a felony plea?
19              THE DEFENDANT:  Yes.
20              THE COURT:  And secondly, probably more importantly,
21    by pleading guilty to this charge, you would be exposing
22    yourself to that maximum penalty that we just talked about.  As
23    we sit here today, nobody knows what Judge Rosenberg is going
24    to do, but you understand that as long as your sentence does
25    not exceed that maximum penalty, doesn't exceed the 10 years
```

1    and three years of supervision and a $5 million fine and a

2    hundred dollars in court costs, as long as she stays within

3    those boundaries you don't get to withdraw your plea simply

4    because you're unhappy with the sentence that you got.  Do you

5    understand that?

6              **THE DEFENDANT:**  Yes, I do.

7              **THE COURT:**  Okay.  Now, the plea agreement also talks

8    about the federal sentencing guidelines.  Have you talked to

9    Mr. Joffe about the guidelines, how they work and how they

10   might apply to your case?

11             **THE DEFENDANT:**  Yes, sir.

12             **THE COURT:**  All right.  I need to go over that with

13   you.  I'm going to go over two different components of that.

14   Okay?

15        First, I'm just going to talk to you about what's going to

16   happen in court after today that will allow the Judge to figure

17   out what the guidelines are, and then I'm going to talk to you

18   about how we come up with the actual numbers.

19             **THE DEFENDANT:**  Okay.

20             **THE COURT:**  Okay?

21        So if your plea is accepted, I'm going to order the

22   probation office to prepare a presentence investigation report.

23   That's a book about you for Judge Rosenberg's benefit.

24             **THE DEFENDANT:**  Uh-huh.

25             **THE COURT:**  And it covers a lot about you.  Your

1    background, your education, your health, if you have any

2    criminal history, your finances, you know, all that stuff.

3         One part of that book is the probation office's

4    calculation of what the probation office thinks the guideline

5    range is.  Okay.  You'll get a copy of the book, you and

6    Mr. Joffe will go over it, and if you don't agree with the

7    guideline calculation you can file an objection.  You can say,

8    they got it wrong, that's too high.  And if you did that, Judge

9    Rosenberg would hear you at your sentencing, and she will

10   decide what she believes the correct guideline range is, and

11   then she'll use that guideline range to impose the sentence in

12   this case.

13        Now, I'm just checking real quickly here.  Under certain

14   circumstances you may be able to appeal.  We'll get to that in

15   a minute.  I know there's an appeal waiver in here.  But the

16   important thing for today's purposes is if you're not happy

17   with the guideline range that Judge Rosenberg calculates after

18   all that, you don't get to withdraw your plea.  You're stuck

19   with her calculation as far as your plea is concerned.  Like I

20   said, you may, under certain circumstances, have the right to

21   appeal, but you don't get to take your plea back.  Do you

22   understand that?

23             **THE DEFENDANT:**  Yeah.

24             **THE COURT:**  Okay.  Let's talk about how we come up

25   with the numbers.  It's a math problem.  Okay?

```
 1        So we look at this book, and the book gives points for
 2   certain things.
 3             THE DEFENDANT:  Uh-huh.
 4             THE COURT:  So for a fraud conviction or fraud crime
 5   like this there's usually a base number, and then there's some
 6   points added up based upon the amount of money involved --
 7             THE DEFENDANT:  Uh-huh.
 8             THE COURT:  -- and then there can be other points
 9   based upon whether you had a leadership role or a lesser role,
10   about whether the government's a victim, whether the victims
11   are elderly or vulnerable.  There's all sorts of different
12   categories.  But ultimately we come up with this number that we
13   call the offense level.
14        And then separately we look at you and we come up with,
15   let's see if you have any criminal background, and if you do,
16   we come up with a different number called the criminal history
17   category.
18        And then we look at a chart.  We simply go down the chart
19   to the offense level and we go across the chart to the criminal
20   history category, and it spits out a range of months.
21             THE DEFENDANT:  Uh-huh.
22             THE COURT:  And Judge Rosenberg has to consider that
23   range, but she doesn't necessarily have to follow it.  So she
24   can sentence you within the range, above the range, or below
25   the range.  But that's how we come up with the number.
```

1      Do you understand that process?

2              THE DEFENDANT:  Yes, yes, sir.

3              THE COURT:  Okay.  Now, I'm sure you and Mr. Joffe

4      have sat down and you've probably looked at that, those

5      guidelines.  You're prob' -- I know you've negotiated with the

6      government, I'm going to get to that in a second.  And

7      Mr. Joffe may have given you, and probably has given you, his

8      best estimate as to where he thinks you might fall under the

9      guidelines.  Am I right about that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Okay.  Mr. Joffe's been doing this a long

12     time and he's very good at what he does, but nobody knows what

13     Judge Rosenberg's going to decide.  So if, for some reason,

14     Judge Rosenberg later decides that the guidelines are different

15     from what he is predicting, you understand that's not going to

16     be a reason for you to get your plea back?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Okay.  I notice in paragraph 15 that

19     there are some joint recommendations of the parties as to what

20     the applicable range ought to be.  Do you see that on paragraph

21     15 on pages 8 and 9?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Okay.  Those are just joint

24     recommendations of the parties.  Okay.  Judge Rosenberg isn't

25     bound by those.  So it's possible that at sentencing, Judge

```
 1   Rosenberg will decide that the guidelines are different from
 2   these or may not accept some or all of these recommendations.
 3   If that happens, once again, under certain circumstances you
 4   might be able to appeal that, but you do not get to withdraw
 5   your plea simply because Judge Rosenberg calculates the
 6   guidelines differently from what the parties have recommended.
 7   Do you understand that?
 8              THE DEFENDANT:  Yes, sir.
 9              THE COURT:  Okay.  I also noticed there's a
10   recommendation of a sentence at the low end of the guideline
11   range and some other things.  To the extent there's any
12   discussion of joint recommendations in the plea agreement, you
13   understand those are merely recommendations, they're not
14   binding on Judge Rosenberg?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  Okay.  Now, one of those recommendations
17   and one of the things I want to particularly talk to you about,
18   because it's a way that you can move up the chart, get some
19   points taken off, is accepting responsibility.  Okay?  And in
20   paragraph 9, it says that in return for your plea, and subject
21   to three conditions I'll talk about in a moment, the government
22   is going to recommend that Judge Rosenberg take off either two
23   or three points from your guideline range.  Now, whether you
24   get two points or three points off depends upon where you
25   start.  So if you start with 16 or more points, you can get
```

1    three points off.  If you start with 15 or fewer points, you

2    can only get two points off.

3         What paragraph 9 says is that the government's going to

4    recommend that you get off the most points you're allowed to

5    get so long as you do three things:  First, when you meet with

6    the probation office you're truthful; second, that you haven't

7    lied to the government to try to get them to offer you this

8    plea agreement; and, third, that from today 'til the day of

9    sentencing, you comply with the law.

10        So do you understand that's what you have to do to require

11   the government to make that recommendation?

12             **THE DEFENDANT:**  Yes, sir.

13             **THE COURT:**  Now, it's not common, it's actually

14   pretty rare, but it is possible at least that Judge Rosenberg

15   may not agree that you've accepted responsibility.  She may not

16   give you those points off.  So now I'm going to sound like a

17   broken record, but if that happens, under some circumstances

18   you may be allowed to appeal it, but you don't get to withdraw

19   your plea for that reason.  Do you understand?

20             **THE DEFENDANT:**  Yes, sir.

21             **THE COURT:**  Okay.  Now, in the plea agreement there's

22   also, and we've talked about this, the language concerning

23   cooperation.  Okay?  I want to just talk to you briefly about

24   that.  That looks like it's paragraphs 11 and 12 of the plea

25   agreement.

1          So cooperation, at least for purposes of the sentencing

2     guidelines, is very much of a one-way street?  Okay.  The

3     government reserves the complete authority whether or not to

4     ask Judge Rosenberg to reduce your guideline range based upon

5     cooperation.  Okay?  So you could be the most cooperative

6     person in the world, you've given them information that led to

7     the indictment and prosecution of 500 people, and if they don't

8     file that motion there's nothing we can do about it.  Okay?

9     Mr. Joffe can't make him file the motion, the Court can't make

10    him file that motion.  Only they can file that motion.

11         So first of all, do you understand that?

12              **THE DEFENDANT:**  Yes, sir.

13              **THE COURT:**  Second of all, even if they file the

14    motion, Judge Rosenberg doesn't have to reduce your guideline

15    range.  Okay?  She may say, well, I'm very happy you

16    cooperated, but I give you no benefit for it.  Or she may

17    reduce it, but not reduce it as much as you might like her to.

18    Do you understand that?

19              **THE DEFENDANT:**  Yes, sir.

20              **THE COURT:**  Okay.  Again, if any of those things

21    happen, you may be able to take it up with a higher court, but

22    you're not going to get to withdraw your plea.  Do you

23    understand that?

24              **THE DEFENDANT:**  Yes, sir.

25              **THE COURT:**  Okay.  Now, I've been talking -- there's

1  also a mention here of restitution.  You understand as part of

2  any sentence, the Judge is required to order restitution?

3          **THE DEFENDANT:**  Yes, sir.

4          **THE COURT:**  And again, the parties have stipulated to

5  an agreed restitution amount, but that's not binding on Judge

6  Rosenberg.  You understand that?

7          **THE DEFENDANT:**  Yes, sir.

8          **THE COURT:**  All right.  Let's jump to paragraph 19.

9  Paragraph 19 is what's called an appeal waiver, and I need to

10  cover that with you because you're giving up a constitutional

11  right here.

12      Have you had a chance to fully discuss your right to

13  appeal and the appeal waiver with Mr. Joffe?

14          **THE DEFENDANT:**  Yes, sir.

15          **THE COURT:**  And did he -- has he answered all your

16  questions about the appeal waiver and explained it to you?

17          **THE DEFENDANT:**  Yes, sir.

18          **THE COURT:**  Okay.  Again, I need to go over it with

19  you, so I apologize if I'm repeating --

20          **THE DEFENDANT:**  That's fine.

21          **THE COURT:**  -- what Mr. Joffe has told you.

22      And here's how I think it's easiest to understand.  When

23  someone is charged with a crime, okay, they could go to trial,

24  and if they're convicted they'll go to sentencing, and then

25  they'll be sentenced.  And if that happens they can appeal,

1  essentially, three things.  Okay?  They can appeal the

2  conviction.  They can go to a higher court and say, hey, the

3  jury got it wrong, I wasn't guilty.  They can appeal the

4  calculation of the guidelines, what we've been talking about.

5  Judge Rosenberg got the numbers wrong.  Okay?  And they can

6  appeal the reasonableness of the sentence.  Okay?  She got the

7  numbers right, the jury convicted me right, but the sentence is

8  still unreasonable.  So those are really the three things

9  somebody can appeal.

10      Now, let's start peeling that onion.  If you plead guilty,

11  you're going to admit you committed the crime, so you can't

12  appeal your conviction.  So you're giving up the first one of

13  those.

14          **THE DEFENDANT:**  Uh-huh.

15          **THE COURT:**  Ordinarily you could appeal the other

16  two.  You could go to the court of appeals and say she

17  calculated the guidelines wrong and my sentence is

18  unreasonable.

19      Paragraph 19 says that you're going to accept whatever

20  guideline range Judge Rosenberg calculates.  Okay?  So you're

21  going to give up your right to say she calculated the

22  guidelines wrong, and if she sentences you within that

23  guideline range you're going to give up your right to say the

24  sentence was unreasonable.  So if she -- if you go to

25  sentencing and Judge Rosenberg gives you a guideline sentence,

```
 1    you're giving up all your rights to appeal.  Do you understand
 2    that?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  Now, if you go to -- if you go to
 5    sentencing and Judge Rosenberg sentences you above the
 6    guidelines, you can appeal that.  Okay?  Or if you go to
 7    sentencing and for whatever reason the government appeals,
 8    usually because she sentenced you below the guidelines, if the
 9    government appeals all bets are off.  You can appeal the
10    calculation of the guidelines, and you can appeal the
11    reasonableness of your sentence.
12        Do you understand?
13              THE DEFENDANT:  Yes, sir.
14              THE COURT:  All right.  Let me pause for a second.
15        Mr. Clouser, do you agree I've accurately summarized the
16    appeal waiver in this case?
17              MR. CLOUSER:  Yes, Your Honor.
18              THE COURT:  Mr. Joffe?
19              MR. JOFFE:  Yes, Your Honor.
20              THE COURT:  Okay.  Good.
21        So understanding those are the parameters of what you're
22    doing here, Mr. Iza, is that what you want to do is go ahead
23    and give up your right to appeal in return for the other
24    benefits you're receiving in this plea agreement?
25              THE DEFENDANT:  Yes, sir.
```

1   **THE COURT:**  All right.  I find that your decision to

2   waive your right to appeal is a knowing, voluntary, and fully

3   informed decision.

4   All right.  I'm going to jump to the last paragraph, Mr.

5   Iza.  That's the paragraph that says that this piece of paper

6   we've been going over is the entire agreement and understanding

7   between you and the government; that there's no side

8   agreements, no side promises, nothing else that you've been

9   promised or offered to get you to go ahead and plead guilty

10  here today.  Is that a correct statement?

11  **THE DEFENDANT:**  Yes, sir.

12  **THE COURT:**  Has anybody offered you anything else

13  other than what we've been talking about in order to get you to

14  plead guilty?

15  **THE DEFENDANT:**  No.

16  **THE COURT:**  All right.  Let me ask you the other side

17  of that question:  Has anybody threatened you in any way?

18  Anybody trying to force you to plead guilty against your will?

19  **THE DEFENDANT:**  Uh, no, no.

20  **THE COURT:**  Okay.  You paused there for a minute.  I

21  just want to make sure I understand.

22  It may be that you feel like you don't have any other

23  choice, that, you know, the options you've been given are so

24  bad, that this is the thing, the right thing for you to do.

25  That's not what I'm talking about.

```
 1          You know, has somebody reached out to you and said, look,
 2   you better go ahead and plead guilty or else, or, you know,
 3   we're gonna hurt your family if you plead guilty, or, you know,
 4   other threats or forces being put on you to make you plead
 5   guilty even though you're not guilty.  That's really the
 6   question.
 7          THE DEFENDANT:  My pause was directly connected to
 8   what happened before Mr. Joffe.
 9          THE COURT:  Okay.
10          THE DEFENDANT:  So it's not since Joffe or the DOJ.
11          THE COURT:  No, but my point is this.
12          As I told you when I started, what I need to be satisfied
13   is simply that your decision is your decision.
14          THE DEFENDANT:  100 percent.
15          THE COURT:  That nobody's making you do this against
16   your will.  That's all I'm asking.
17          THE DEFENDANT:  Okay.
18          THE COURT:  Has anybody threatened you --
19          So, right, they can make you do it against your will one
20   of two ways.  They can give you something, right, and say, hey,
21   I know you don't want to do this, but I'll give you something
22   if you do it.  Or they can say, I know you don't want to do
23   this, but if you don't do it, I'm going to do something bad to
24   you.
25          So you already answered the first question.
```

 1          **THE DEFENDANT:**  Uh-huh.

 2          **THE COURT:**  Nobody's giving you anything.

 3          **THE DEFENDANT:**  No.

 4          **THE COURT:**  I'm just asking you the second question.

 5     Has anybody threatened you in any way?

 6          **THE DEFENDANT:**  No.

 7          **THE COURT:**  Okay.  Are you pleading guilty because

 8     you did, in fact, do the things the government says that you

 9     did?

10          **THE DEFENDANT:**  Yes, Sir.

11          **THE COURT:**  Okay.  Now, Mr. Iza, if you do receive a

12     jail sentence in this case, parole has been abolished.  So

13     you're not going to be released early from jail on parole.  Do

14     you understand that?

15          **THE DEFENDANT:**  No.

16          **THE COURT:**  Okay.  So let me explain.

17       In the federal prison system, let's say you get a sentence

18     of, I'll just take a really simple number, a year.

19          **THE DEFENDANT:**  Uh-huh.

20          **THE COURT:**  Okay?  I hope for your sake that's, you

21     know, that or lower, but I don't know what Judge Rosenberg's

22     going to do.

23          **THE DEFENDANT:**  Uh-huh.

24          **THE COURT:**  You get a year.

25       They certainly have policies that say if you have good

1  behavior you can get out early, or if -- there's all sorts of

2  other family situations, health reasons.  There may be all

3  kinds of reasons why once somebody's in the prison system they

4  can get released before the full term of their sentence runs

5  out.

6          THE DEFENDANT:  Uh-huh.

7          THE COURT:  We used to have in the United States what

8  was called a parole system, where you could go in front of a

9  group of people and you would say, look, I've learned my

10 lesson, I've been a good boy, you should let me out early, and

11 the parole board would have the ability to do that.  So even

12 though the Judge sentenced you to 10 years, they could release

13 you after five years.  Okay.  We don't have that anymore.

14         THE DEFENDANT:  Uh-huh.

15         THE COURT:  So there are many ways you can try to get

16 released early from jail if you get a jail sentence, but parole

17 is not one of them.

18         THE DEFENDANT:  Oh, okay.

19         THE COURT:  Do you understand?

20         THE DEFENDANT:  Now, I understand, yes.

21         THE COURT:  Okay.  Good.

22     All right.  Let me pause for a moment.  We've been talking

23 a lot about a guilty plea.  I need to stop for a moment and

24 talk to you about what your option is.  Okay?

25         THE DEFENDANT:  Uh-huh.

1        **THE COURT:**  And again, I'm sure you've talked about

2    this with Mr. Joffe, but I need to hear it from your own mouth.

3        You do have the option to continue to plead not guilty and

4    go to trial.  And if you did that, you'd have a number of

5    rights, and that's what I want to talk to you about now.

6        You'd have the right to a trial by jury, and we would

7    instruct the jury that you're presumed to be innocent.  You

8    don't have to prove your innocence, and the government has to

9    prove your guilt beyond a reasonable doubt.

10        At the trial, you'd have the right to be assisted by a

11    lawyer at all times, and if, for some reason, Mr. Joffe

12    couldn't continue to represent you and you couldn't afford to

13    hire a different lawyer, we'd appoint a lawyer to represent

14    you.

15        At the trial, you'd have the right to confront the

16    witnesses against you.  They'd have to come in and sit on the

17    witness stand and look you in the eye, and Mr. Joffe would

18    question them on your behalf.  We don't have secret trials here

19    in the United States.

20        You'd have the right to what's called compulsory process.

21    That's a fancy legal way of saying if there was somebody out

22    there in the community who you thought could help you, could

23    help show that you didn't commit this crime, we'd offer -- we'd

24    serve them with a subpoena, we'd make them come to court, and

25    you could make people come to court to help you.  You'd have

1    that right.

2         And at the trial, because you don't have to prove

3    anything, you don't have to say anything.  You could remain

4    silent, okay, and you could sit there and say nothing, and we

5    would instruct the jury at the end of the trial that they

6    couldn't hold your silence against you; that the government has

7    to prove the case, and you have every right to just sit there

8    and be silent.

9         On the other hand, it's your trial.  If you wanted to

10   testify, if you wanted to tell your story to the jury, you

11   could do that and nobody could stop you.

12        So do you understand those are all the rights you would

13   have at a trial?

14             **THE DEFENDANT:**  Yes, sir.

15             **THE COURT:**  Now, maybe this is obvious, but if you go

16   ahead and plead guilty today, you're not going to have a trial.

17   You're going to give up all of those rights except one.  You'll

18   continue to have a lawyer through your sentencing in this case.

19        Do you understand you're giving up those rights?

20             **THE DEFENDANT:**  Yes, sir.

21             **THE COURT:**  Okay.  And now we're going to circle back

22   to what I talked about with you briefly.

23        If you go ahead and plead guilty today, you're also giving

24   up two other things.  You're giving up forever your chance to

25   file a motion to suppress, and you're giving up forever your

```
1   chance to say you have a defense to these charges, to come in

2   and say, wait, they can't prove the elements of the crime.  It

3   was less than a million dollars.  It wasn't a government

4   agency.  I had no intent.  You're giving up forever all those

5   defenses.

6        You understand that?

7             THE DEFENDANT:  Yes, sir.

8             THE COURT:  Okay.  I have another document here, it's

9   called the Agreed Factual Basis for Guilty Plea.  It is seven

10  pages long.

11            THE DEFENDANT:  Uh-huh.

12            THE COURT:  And once again, Mr. Iza, I'm holding it

13  up.  Is that your signature on the last page?

14            THE DEFENDANT:  Yes, sir.

15            THE COURT:  And before you signed this document, did

16  you and Mr. Joffe go over each and every paragraph?

17            THE DEFENDANT:  Yes, sir.

18            THE COURT:  What it means to sign this document is

19  you're telling me that the facts contained in this written

20  factual proffer are true and the government could have proved

21  them if it had to.  Do you understand that's what it means to

22  sign the document?

23            THE DEFENDANT:  Yes, sir.

24            THE COURT:  And is that an accurate and truthful

25  statement?  Are these facts true, and could the government
```

1    prove them if it had to?

2              **THE DEFENDANT:**  Yes, they are true.

3              **THE COURT:**  Okay.  Very well.

4         I'm going to turn now to Mr. Clouser and ask him to

5    summarize -- he's not going to read all seven pages, I hope,

6    but summarize on the record what the evidence is that the

7    government would have proven if we had a trial.

8         Mr. Iza, I need you to do something for me, though.  I

9    need you to listen carefully, because when he's done I'm going

10   to ask you if you disagree with any of these facts.

11             **THE DEFENDANT:**  Okay.

12             **THE COURT:**  So Mr. Clouser, if you want to remain

13   seated just use the microphone.  If you want to stand, stand.

14   Just use the microphone, and could you please put the factual

15   basis in the record.

16             **MR. CLOUSER:**  Thank you, Your Honor.  And if it's all

17   right with the Court, I'll remain seated.

18             **THE COURT:**  Absolutely.

19             **MR. CLOUSER:**  If this were to have proceeded to

20   trial, the United States would have established and proved the

21   following facts beyond a reasonable doubt:

22        Beginning in or around September 2019 and continuing

23   through in or around September 2022, in Miami-Dade, Broward,

24   Palm Beach and St.  Lucie Counties, in the Southern District of

25   Florida and elsewhere, the defendant did knowingly execute and

1   attempt to execute a scheme and artifice with the intent to

2   defraud the United States and to obtain money and property by

3   means of false and fraudulent pretenses, representations and

4   promises in any subsidy, insurance, or other form of federal

5   assistance, the value of which was over $1 million or more.

6   That is, advanced premium tax credits, or APTCs, or subsidies

7   offered under the Affordable Care Act plans in the value of

8   more than a million dollars, in violation of Title 18, United

9   States Code, 1031.

10       The facts of that offense:  From in or around August 1988

11  through in or around February 2021, Company 1 was an insurance

12  brokerage company formed under the laws of Florida with its

13  principal place of business in Stuart, Florida.  Company 1 sold

14  various types of insurance throughout Florida, including after

15  the ACA went into effect, ACA plans.

16       On or about February 26, 2021, the assets of Company 1

17  were acquired by another insurance brokerage firm, Company 2, a

18  company formed under the laws of Florida with principal place

19  of business in Orange County, Florida.  Company 2 continued to

20  do business under the name of Company 1.

21       Mr. Iza served as one of Company 1's executive vice

22  presidents and remained an executive vice president after

23  Company 2 acquired Company 1 and throughout the relevant time

24  period charged in the information.

25       And from in or around September 2019 and continuing

through in or around September 2022, Mr. Iza and other

individuals falsified and caused the falsification of thousands

of ACA plan applications by misrepresenting consumers' incomes

to make them appear eligible for subsidies, when in fact they

were not.  Mr. Iza and others also manipulated SEPs, or special

enrollment periods, to enroll consumers in subsidized ACA plans

year round in order to maximize the total volume of

enrollments, including fraudulent enrollments.

Individuals on behalf of Company 1 and Company 2 engaged

marketing companies, a marketing company to conduct street

marketing campaigns for ACA plans.  The street marketers were

paid a commission by Company 1 and Company 2 in exchange for

referring consumers for enrollment in ACA plans.  The street

marketers recruited consumers at homeless shelters, bus stops,

clinics and other areas where low income individuals were

likely to be found.

Mr. Iza knew that street marketers offered bribes to

consumers in exchange for agreeing to enroll in ACA plans.  Iza

also knew that street marketers coached consumers on how to

respond to application questions, including how to provide

false responses to questions about income.  And Mr. Iza knew

that street marketers often provided invalid identifiers for

the individuals they referred to for enrollment; that is,

referred consumers with Social Security numbers or other

identifiers that they did not -- that did not match the

1  consumer's reported name.

2      Individuals at Company 1 and Company 2 directed employees

3  at Company 1 and Company 2 to enroll consumers by referring

4  marketing company -- consumers referred by the marketing

5  company in fully subsidized plans.  By enrolling consumers in

6  these fully subsidized plans, individuals at Company 1 and

7  Company 2 ensured that consumers had no financial

8  responsibility to maintain the plan, since the subsidy payments

9  fully covered the premiums.  However, the vast majority of

10  consumers referred by the marketing company had little or no

11  qualifying income and were ineligible for subsidies.

12      To ensure that these consumers could nonetheless be

13  enrolled in subsidized plans, Company 1 and Company 2

14  employees, with Mr. Iza's and others' approval, used call

15  scripts designed to lead consumers into agreeing that Company 1

16  and Company 2 could enter their income at the minimum amount

17  required for a federal subsidy.  Mr. Iza and others supervisors

18  at Company 1 and Company 2 authorized Company 1 and Company 2

19  employees to bump up, i.e. falsely and fraudulently increase

20  income to the minimum required for a federal subsidy.

21      For example, Mr. Iza and other supervisors at Company 1

22  and Company 2 directed the company call center employees to ask

23  consumers to agree that the consumer would attempt to make a

24  certain income, often $13,000 a year, or another income near

25  the federal poverty letter -- federal poverty level for the

applicable year, or to input certain income on the application

even where the consumer initially reported that his or her

income was zero.  This was often done without inquiry into the

consumer's potential sources of income and without any

good-faith basis to believe the consumer was going to make the

minimum income.

Mr. Iza and other supervisors at Company 1 and Company 2

thus routinely caused reported incomes to be falsified to

ensure the consumers would enroll or would be enrolled in a

fully subsidized ACA plan.

Once a consumer was enrolled in the ACA plan the exchange

often asked consumers to verify specific information, including

income.  If a consumer did not verify their income within a

certain period of time, typically 90 days, the consumer was at

risk of losing the subsidy.  At Mr. Iza's and other individuals

at Company 1 and Company 2's direction, Company 1 and Company 2

employees performed subsidy reviews or subsidy fixes, whereby

the employees accessed consumers' ACA plan information online

and indicated that the consumer experienced a life change.

For consumers referred by the marketing company, Company 1

and Company 2 employees typically did not contact the consumer

before performing this subsidy fix, did not attempt to verify

the consumer's income and had no basis for representing that

the consumer had experienced a life change.  This process

ensured that the consumers did not lose the subsidy at the end

1    of the 90-day verification window.

2         Finally, during much of the relevant time period, Mr. Iza

3    and others at Mr. Iza's and other Company 1 and Company 2

4    supervisors' direction, Company 1 and Company 2 employees

5    routinely secured false and fraudulent Medicaid denials on

6    behalf of consumers and used those denials to enroll consumers

7    in ACA plans outside of open enrollment, all to circumvent the

8    limitations of open enrollment.  In truth and in fact, the

9    consumers typically did not experience a job change, loss of

10   coverage, move, marriage or similar qualifying life event.

11   Instead, at Mr. Iza's and other Company 1 and Company 2

12   supervisors' direction, employees of Company 1 and Company 2

13   submitted Medicaid applications for large volumes of consumers,

14   including consumers referred by the marketing company in a

15   manner designed to secure a denial.

16        At Mr. Iza's and other Company 1 and Company 2

17   supervisors' direction, Company 1 and Company 2 employees then

18   used these denials to represent to the exchange that the

19   consumers qualified for a special enrollment period.  Through

20   this Process, employees of Company 1 and Company 2 could enroll

21   consumers in ACA plans at any time during the year, entirely

22   circumventing open enrollment and special enrollment

23   limitations.

24        At Mr. Iza's and other Company 1 and Company 2

25   supervisors' direction, Company 1 and Company 2 employees used

1   this process to submit numerous applications for ACA plans

2   containing false and fraudulent income amounts on behalf of

3   consumers referred by the marketing company.

4        In total, Mr. Iza and other Company 1 and Company 2

5   supervisors caused Company 1 and Company 2 to submit

6   applications for thousands of consumers referred by the

7   marketing company.  The government paid subsidies on these

8   plans in at least the approximate amount of $133,900,000.

9        And as part of the scheme, on or about April 8th, 2021,

10  Mr. Iza and other individuals at the company submitted or

11  caused to be submitted an application to enroll in an ACA plan

12  that contained a false and fraudulent income amount on behalf

13  of consumer P.B.

14       THE COURT:  Thank you very much.

15       Mr. Iza, I know that was a long proffer, but do you agree

16  that you did the things that the government says that you did?

17       THE DEFENDANT:  Yes.

18       THE COURT:  Okay.  Do you disagree with any of the

19  facts that the government just proffered?

20       THE DEFENDANT:  Not with the facts.

21       THE COURT:  Okay.  I find that the facts that are set

22  forth in the written proffer agreed to by Mr. Iza, as well as

23  the oral proffer supplementing the written proffer, which is

24  also agreed to by Mr. Iza, are sufficient to establish the

25  crime, the -- all the essential elements of the crime alleged

```
 1   in the information.
 2         Mr. Iza, when we started, I told you I wouldn't let you
 3   plead guilty, you couldn't plead guilty unless I gave you
 4   permission.  I'm more than satisfied that you know what you're
 5   doing.  You're intelligent.  You've thought this through
 6   carefully with the advice of counsel.  So in a minute, I'm
 7   going to ask you if you want to formally change your plea.
 8   Before I ask you that very important question, however, do you
 9   need any more time to think about it or to discuss it with your
10   lawyer?
11              THE DEFENDANT:  No.
12              THE COURT:  How do you now plead to the charge and
13   the information, guilty or not guilty?
14              THE DEFENDANT:  Guilty.
15              THE COURT:  Mr. Clouser, I think the only victim in
16   this case is the government, but I'll ask anyway.  Are there
17   any victims who wish to be heard at this time?
18              MR. CLOUSER:  No, Your Honor.
19              THE COURT:  All right.  Thank you.
20         I find that Mr. Iza is intelligent and alert, he is fully
21   competent and capable of making an informed decision in this
22   case, he's aware of the nature of the charges and the
23   consequences of this plea, and his plea of guilty is a knowing
24   and voluntary plea, supported by an independent basis in fact
25   containing each of the essential elements of the offense.  I
```

1   find that he has freely, voluntarily, and intelligently entered

2   his plea of guilty here today with no promises or threats and

3   without any mental impediment of any kind.

4        In addition, I find he's had the advice and counsel of a

5   highly competent lawyer with whom he says he is fully

6   satisfied.

7        I therefore recommend that Judge Rosenberg accept his

8   plea, that she adjudge him guilty of count 1 of the

9   information.

10       I'll order the probation office to prepare that written

11  presentence report that we've talked about.  Mr. Iza, as I

12  explained, you'll get a copy of that, and anything in there

13  that's wrong, you can file an objection and they'll fix it.

14            **THE DEFENDANT:**  Okay.

15            **THE COURT:**  You'll have a chance to speak directly to

16  Judge Rosenberg at your sentencing, as will Mr. Joffe, as will

17  any friends or supporters that you would like to have speak on

18  your behalf.

19            **THE DEFENDANT:**  Okay.

20            **THE COURT:**  She'll set the sentencing in this case by

21  separate order.

22       What's the government's position as to whether Mr. Iza

23  should be continued on the same conditions of bond previously

24  set?

25            **MR. CLOUSER:**  The government believes he should

1    continue on the same conditions of bond.

2         **THE COURT:**  Very well.  I find by clear and

3    convincing evidence that he would neither create an

4    unreasonable risk of flight nor danger to the community, and so

5    I will release him on the same terms and conditions.

6         So Mr. Iza, I am going to order you at this time that you

7    must appear as required on the day of sentencing in this case.

8    If you fail to appear, a lot of bad things are going to happen.

9    Okay?  You've got a carefully negotiated benefits in this case.

10   You'll probably lose most of those if you don't show up, you'll

11   be committing a new crime that's punishable by an additional

12   time in jail, and you just won't be putting yourself in a good

13   light with Judge Rosenberg when you're eventually in front of

14   her.

15        I would also advise you there's at least a possibility

16   that you will be taken into custody at the time of your

17   sentencing.  So work with your lawyer, get your affairs in

18   order, make whatever arrangements you need to make so that

19   you're prepared on the day of sentencing.  You know, plan for

20   the worst and hope for the best.

21        But with that, is there anything further that we need to

22   do from the defense today, Mr. Joffe?

23        **MR. JOFFE:**  No, Your Honor.  Thank you.

24        **THE COURT:**  From the government, Mr. Clouser?

25        **MR. CLOUSER:**  Nothing, Your Honor.  Thank you very

1    much.

2           **THE COURT:**  All right.  Thank you all very much.  I

3    wish everybody a good weekend, and we'll be in recess.

4         Thank you.

5           **THE DEFENDANT:**  Thank you.

6         (Proceedings concluded at 11:42 a.m.)

7                              *  *  *  *  *

8                            CERTIFICATE

9         I, Stephen W. Franklin, Registered Merit Reporter, and

10   Certified Realtime Reporter, certify that the foregoing is a

11   correct transcript, to the best of my ability, from the DIGITAL

12   AUDIO RECORDING of proceedings in the above-entitled matter.

13        Dated this 24th day of August, 2025.

14

15        _____

16        Stephen W. Franklin, RMR, CRR

17

18

19

20

21

22

23

24

25