UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:24-CR-80154

UNITED STATES OF AMERICA,

vs.

DAFUD IZA,

      Defendant.
_____/

## UNITED STATES' SENTENCING MEMORANDUM

      The United States of America, through undersigned counsel, respectfully submits this memorandum in advance of the sentencing of Defendant Dafud Iza (the "Defendant" or "Iza").

      This case involves a years-long scheme in which Defendant, along with others, defrauded the government out of more than a hundred million dollars in the form of Affordable Care Act ("ACA") subsidies. Iza was the Executive Vice President of Fiorella Insurance Agency ("Fiorella"), an insurance brokerage company in Florida, and participated in a scheme to submit thousands of false and fraudulent enrollment applications for Affordable Care Act ("ACA") Plans. Iza and his accomplices engaged in deceptive marketing practices to recruit consumers for fully-subsidized ACA Plans—that is, plans where the government pays the entire cost—and then lied on the consumers' ACA Plan applications to ensure the consumers were signed up in these subsidized plans.

      The evidence presented at the recent trial of Defendant's accomplices, including the COO and President of Fiorella, showed the magnitude and seriousness of the fraud. *See United States v. Cory Lloyd et al.*, 25-cr-80015-DMM (S.D. Fla.). Not only did the scheme cost the government more than a hundred million dollars in taxpayer money paying for ACA Plans that consumers did

1

not qualify for—and sometimes did not want or even know they had—the brazen and systematic lies at times hurt the very people they were targeting to enroll. People who were reliant on Medicaid or other community programs for health services experienced disruptions in their access to critical medication, care, and treatment, because Iza and his accomplices enrolled them in the lowest-tier ACA Plans which had high co-pays and deductibles, but which, in turn, resulted in greater commission payments to Fiorella.

The seriousness of the crime and the magnitude of the harm warrant a custodial sentence. However, that sentence should take into account the fact that Iza accepted responsibility for his role quickly, pled guilty, and has provided substantial assistance to the government in advancing the investigation of others. Indeed, Iza testified over the course of two days at the recent trial of co-defendants Cory Lloyd and Steven Strong, both of whom were convicted at trial. For the reasons discussed more fully below, the Government respectfully recommends a custodial sentence of 35 months.

I. PROCEDURAL HISTORY AND OFFENSE CONDUCT

On December 3, 2024, Iza was charged by information with one count of major fraud against the United States, in violation of 18 U.S.C. § 1031. [D.E. 1].[1] On April 18, 2025, Iza pled guilty to the information before United States Magistrate Judge Reinhart [D.E. 22], and the District Court accepted his plea on May 23, 2025 [D.E. 23].

Separately, on February 12, 2025, two additional defendants, Cory Lloyd and Steven Strong, were charged by indictment in connection with the same fraud scheme. Cory Lloyd was a part-owner, the Chief Operating Officer, and later President of Fiorella. Steven Strong was the president and owner of a marketing company that recruited consumers for Fiorella to enroll in ACA

---

[1] Iza signed an initial plea agreement in June 2024, and signed a revised agreement on November 13, 2024 (the operative plea agreement).

Plans.  A superseding indictment was returned on September 16, 2025, and Lloyd and Strong proceeded to trial on November 3, 2025.  On November 17, 2025, the jury returned guilty verdicts against Lloyd and Strong on charges of conspiracy to commit wire fraud, wire fraud, and conspiracy to defraud the United States for their roles in the systematic fraud that resulted in more than a hundred million dollars in subsidies on fraudulent ACA Plans.

The evidence at trial showed there were several key steps in the fraud.  First, the defendants sent street marketers to recruit vulnerable people to sign up for ACA Plans through Fiorella.  Strong hired street marketers to approach people, including people experiencing homelessness, drug addiction, or other difficult life circumstances, and persuade them to sign up for ACA Plans with Fiorella—sometimes by paying those consumers $5 or $10 to sign up.

Second, the street marketers called in to Fiorella's call center, where the agents were trained to use leading questions to ensure consumers would agree to enroll, and to agree that they would "attempt" to make the minimum income required to receive a government subsidy.  There was no effort to determine what these consumers actually made, or even expected to make.  The agents were trained and instructed to get the consumer to agree to a magic number and move on.

Third, Fiorella employees would submit fake Medicaid applications designed to get people denied from Medicaid (even if they otherwise would have been eligible) so that Fiorella could enroll consumers year-round, circumventing open enrollment requirements.  Fiorella processors used step-by-step instructions that were developed to ensure consumers would get denied by Medicaid—a process that not only prevented the ACA Exchange from fairly evaluating whether a consumer *could* qualify for Medicaid, which offered considerably better coverage at lower cost, but also circumvented the open enrollment limitations on signing up for insurance.  *See* Trial Government Exhibits, *United States v. Cory Lloyd and Steven Strong*, Case No. 9:25-cr-80015

(S.D. Fla.), [D.E. 190-194] (hereinafter "Trial Gov. Ex."), at Ex. 312.  These fake applications, signed by Fiorella employees under penalty of perjury, reported, among other things, that the consumers had no jobs, no money, and did not expect to make any income—which was the exact opposite of what Fiorella employees typically reported on the ACA Plan applications.

Once Fiorella had the Medicaid denial in hand, Fiorella employees would submit an ACA Plan application for the same consumer, again under penalty of perjury, reporting that the consumer was working and expecting to make the minimum income required to qualify for a fully-subsidized ACA Plan.  As the evidence at trial made clear, employees were routinely instructed to just "put them at the minimum" for any consumer who didn't have enough income to qualify.  *See*, *e.g.*, Trial Gov. Ex. 366 at 11-12.

Finally, after an ACA Plan application was submitted, CMS often requested additional documents to verify the information submitted.  If a consumer did not submit the required information, they could lose their subsidy.  Fiorella developed a "subsidy fix" process to circumvent these verification requests in which Fiorella employees were instructed to fabricate "life changes" for the consumers that would kick out the deadline to verify information such as income.  This process effectively prevented the ACA Exchange from properly verifying consumers' reported incomes, and meant that the government kept paying the subsidies for ineligible consumers.  This process also ensured that Fiorella continued to collect commission payments.

Iza served as Fiorella's executive vice president and operations manager during much of the relevant time period, reporting to Cory Lloyd.  During most of the fraud, Fiorella used WhatsApp chats to allow employees to communicate in real-time regarding the operations— including real-time complaints about the marketing, about consumers having no income, and other

4

day-to-day issues. Iza was the highest-level employee on many of those chats. *See, e.g.*, Trial Gov. Exs. 362 (customer service WhatsApp chat), 363 (digital team WhatsApp chat), 364 (Florida Care team WhatsApp chat), 366 (processors group WhatsApp chat), 367 (renewals management WhatsApp chat). These chats, involving Iza, showed the fraud in operation. For example, in the Florida Care team WhatsApp chat, call center agents routinely flagged marketers bribing people to sign up. *See* Trial Gov. Ex. 364 at 9 ("[Street Marketer] is giving people $5 to sign up. We cannot sign anyone up if they are getting money for it."), 26 ("[Street Marketer] called in said he is frustrated because of the gentleman that said he was offered money. He said it wasn't him that offered the money, it was [another Street Marketer]. Idk thought I'd let you know."). These types of complaints were a constant refrain. *See* Trial Tr. at Vol. 3, 131:6-12 ("Q. Did this ever stop? These complaints or these reports of marketers paying people, did that ever conclude? A. No. Q. Did that keep happening while you worked at Fiorella? A. Yes. How frequent of a problem was that? A. Daily."). Neither Iza nor others in management took steps to fire the marketers who were bribing consumers to sign up for ACA Plans, or to terminate Fiorella's relationship with Steven Strong, the outside vendor for the street marketing services. *See id.* at 131:13-15 ("Q. Are you aware of whether the marketers who were doing that were fired? A. No, they were not.").

And the evidence at trial showed that this system of fraud had real consequences—not just for the government, but for those vulnerable people targeted by this scheme. For example, a physician who treated patients enrolled in ACA Plans by Fiorella testified at trial. This physician treats people experiencing drug addiction and HIV-related complications and testified about multiple of his patients who were receiving treatment for free through Medicaid or local assistance programs, but who became enrolled in ACA Plans through this scheme. He explained that as a result, these individuals experienced significant disruptions in care—including disruptions in their

access to drug addiction treatment and HIV medication. These patients could not pay the high deductibles and co-pays associated with the ACA Plans. And, because they were now insured, they could no longer use the other coverages that provided care, such as free county plans or Medicaid. In a complaint that was sent to Lloyd about a consumer who lost access to their Medicaid coverage, another physician (who also testified at trial) explained it succinctly: "I don't know how to say it otherwise but this is wrong. It is unethical to do this, Medicaid would be far better for him." Trial Gov. Ex. 288.

## II. THE UNITED STATES RECOMMENDED GUIDELINES CALCULATION

The United States recommends the guidelines calculated by Probation in the presentence investigation report, D.E. 41, and recommends a sentence based on the bottom of the Sentencing Guidelines range.

The base offense level for the Defendant's conduct is 6 under USSG § 2B1.1(a)(2). The offense level is increased by 24 levels based on the agreed loss reflected in the Defendant's plea agreement—$133,900,000. USSG § 2B1.1(b)(1)(M), *see* D.E. 20 at 8, 18. The offense level is further increased by 2 levels because the offense involved sophisticated means and the defendant himself engaged in or caused the conduct constituting sophisticated means. Here, Iza's role in the processing department's submission of electronic applications, and manipulating the ACA exchange system in order to prevent the ACA exchange from verifying information (and potentially detecting the false income information), as well as the processes to ensure Medicaid denials, qualify as sophisticated. *See* USSG § 2B1.1(b)(10), and comment 9 (sophisticated means includes complex or especially intricate conduct to conceal offense); *see United States v. Kimbrough*, 297 F. App'x 960 (11th Cir. 2008) (applying sophisticated means where "offense involved repeated fraudulent conduct occurring over an extended period of time" and "creat[ing] fictitious entries" to conceal the offense); *United States v. Holland*, 2023 WL 110585, *9-10 (11th Cir. Jan. 5, 2023)

6

(discussing sophisticated means enhancement and holding that "using multiple accounts and making false documents to hide transactions can constitute sophisticated means"). Iza participated in the sophisticated conduct—including in the Medicaid denials process and the subsidy fix process—designed to circumvent CMS's systems. The resulting offense level is 32.

Iza accepted responsibility for his conduct. As such, the offense level is reduced by 2 levels under USSG § 3E1.1(a). Further, Iza notified the government of his acceptance of responsibility early, and his acceptance assisted the government in its investigation and preserved government resources. As such, the Government moves for an additional one-level decrease based on his timely acceptance pursuant to USSG § 3E1.1(b).

Finally, based on information provided by the probation officer, Iza is eligible for the zero-point offender reduction under USSG § 4C1.1(a)(1), and therefore the offense level is further reduced by 2 levels.

The resulting total offense level is 27. The guidelines range for this offense level, at a criminal history category I, is 70-87 months.

### III. THE DEFENDANT'S SENTENCE SHOULD BE REDUCED PURSUANT TO RULE 5K1.1.

Iza provided substantial assistance to the government, which will be described more fully during the sentencing hearing. Iza not only accepted responsibility early, he debriefed with the government multiple times following his acceptance of responsibility, and testified at trial against his co-defendants. His cooperation warrants a reduction in his sentence, and the Government, by motion at D.E. 43, requests that the Court reduce the Defendant's sentence by 50%. [D.E. 43].

### IV. THE DEFENDANT'S SENTENCE MUST REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROVIDE SPECIFIC AND GENERAL DETERRENCE.

The nature and seriousness of this crime warrants a custodial sentence. *See* 18 U.S.C. § 3553(a)(2)(A). Iza and his co-defendants took advantage of people experiencing homelessness,

people experiencing mental health and drug addition issues, and other vulnerable people to line their pockets. As shown at the trial of Iza's accomplices, the system of fraud orchestrated by Iza and his accomplices steamrolled over consumers, with no effort to submit truthful and accurate ACA Plan applications. Instead, Iza and his accomplices took steps to ensure tens of thousands of people would get enrolled in fully-subsidized ACA Plans without regard to eligibility and without regard to the consumers' needs. As a result of this system of fraud, as shown at trial, the government paid out over a hundred million dollars in subsidies on fraudulent ACA Plans. And vulnerable people suffered for it.

The Court must also consider deterrence—both specific deterrence of the defendant and general deterrence of other potential defendants—in fashioning an appropriate sentence. 18 U.S.C. § 3553(a)(2)(B). Although this is Iza's first conviction, this scheme lasted years. Iza went to work, day in and day out, ensuring the system of fraud continued to operate and continued to make money. Iza received complaint after complaint, and did not stop the machine. In fact, he made sure it kept running. A custodial sentence will deter Iza from participating in such a scheme in the future.

The nature of the fraud also warrants a sentence that will deter others from this type of scheme. This large-scale fraud involved taking advantage of a system that relies on the trust and good faith of participants to function—including insurance agents and brokers who help consumers get enrolled in ACA Plans. When those agents and brokers engage in a scheme like this, designed to prevent the program from identifying the fraud and at such a massive scale, the program and its participants suffer. A custodial sentence will send an appropriate deterrence message to agents and brokers that they cannot lie to the government to make money in this space, and that there are serious consequences for doing so.

Moreover, as the Eleventh Circuit has noted, post-*Booker*: "[E]conomic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus these crimes are "prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the Martin court noted that the legislative history of Section 3553 showed that Congress viewed deterrence as "particularly important in the area of white-collar crime . . . . even where [the defendants] might themselves be unlikely to commit another offense." *Id.* (emphasis added) (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Court in Martin held that "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. General deterrence is "particularly important in the area of white-collar crime," because would-be perpetrators are watching. *See id*.

Furthermore, general deterrence is especially important in white collar offenses where greed is the motive. In *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014), for example, the Eleventh Circuit rejected a probationary sentence for a white-collar defendant—even though the Government had filed a 5K motion because "general deterrence is an important factor in white collar cases, where the motivation is greed . . . . [W]e have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *Id.* at 1308. The Eleventh Circuit went on to say that the low sentence imposed conveys the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty," and accordingly was not just. Second, too-low sentences do not serve as general deterrence because "[t]he threat of spending time on probation simply does not,

and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* at 1310-11; *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("[B]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). The guidance from *Hayes* and *Kuhlman* squarely applies in full force here.

\*   \*   \*   \*

For these reasons, the United States respectfully recommends a custodial sentence of 35 months. The United States asks that the Court order restitution, which is mandatory for this offense, in the amount of $133,900,000, which represents the stipulated restitution amount in Defendant's plea agreement. D.E. 20 at 9.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court adopt the guidelines calculation in the PSR, reduce the Defendant's sentence pursuant to Rule 5K1.1, and sentence Defendant to a prison term of 35 months and a restitution order in the amount of $133,900,000.

Dated: December 9, 2025

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

By: /s/ D. Keith Clouser
D. Keith Clouser
Florida Special Bar No. A5502882
Trial Attorney

        Jamie de Boer
        Florida Special Bar No. A5502601
        Assistant Chief

        United States Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, NW
        Washington, DC 20005
        Tel.: (202) 256-0867 (Clouser)
        Tel.: (202) 304-6801 (de Boer)
        David.Clouser@usdoj.gov
        Jamie.deBoer@usdoj.gov

## **CERTIFICATE OF SERVICE**

    I hereby certify that, on December 9, 2025, I served and filed the foregoing document with the Clerk of the Court via ECF.

        By: /s/ *D. Keith Clouser*
        D. KEITH CLOUSER
        Trial Attorney
        United States Department of Justice
        Criminal Division, Fraud Section